UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT JAMES KEATON,

   Plaintiff,

v.           Case No. 3:22-cv-311-MMH-LLL

JAMES CARTWRIGHT, et al.,

   Defendants.

_____

## **ORDER**

### **I. Status**

  Plaintiff Robert James Keaton, an inmate of the Florida Department of Corrections (FDOC), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended Complaint (Amended Complaint; Doc. 25), with exhibits (Docs. 25-1 through 25-8). Keaton names seven Defendants: (1) James B. Cartwright; (2) Anthony L. Smith; (3) Ryan D. Mason; (4) Quinton M. Williams; (5) John M. Manning; (6) Lyndell B. Hampton; and (7) Charles C. Bias. Amended Complaint at 2-3. He asserts claims of excessive force and failure to intervene. See generally id.

Before the Court is Defendants' Motion for Summary Judgment (Motion; Doc. 62), with exhibits (Docs. 62-2 through 62-37).[1] The Court advised Keaton of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him an opportunity to respond to the Motion. See Order (Doc. 26); Summary Judgment Notice (Doc. 63). Keaton filed a response in opposition to the Motion (Response; Doc. 67), with exhibits (Doc. 67-1). He also filed a Motion to Strike Defendants' Motion for Summary Judgment (Doc. 70), arguing the Motion was untimely filed.[2] Defendants' Motion is ripe for review.

## II. Keaton's Allegations

In his Amended Complaint, Keaton alleges that in June 2018, he had surgery on his left eye to repair a detached retina. Amended Complaint at 4.

---

[1] In the Motion, Defendants also list "Armstrong" as being a Defendant (Motion at 1), however, Keaton does not sue an "Armstrong" here.

[2] The Court set the dispositive motion deadline as September 18, 2024. See Order (Doc. 55). On September 18, 2024, Defendants filed a motion requesting permission to file a summary judgment motion in excess of 25 pages. Doc. 57. The Court granted the request on September 23, 2024. See Order (Doc. 58). That same day, Defendants filed motions to seal exhibits (Docs. 59, 60), which the Court denied as moot on September 27, 2024 (see Order (Doc. 61)). Defendants filed the Motion on September 30, 2024. See Motion. While Defendants should have requested additional time to file the Motion, considering the procedural posture of the case and the fact that Defendants were filing motions related to their summary judgment Motion, the Court will accept it as timely filed and deny Keaton's Motion to Strike.

Following the surgery, officials transported him to Union Correctional Institution to recover. Id. About a month after his transfer, on July 10, 2018, Keaton attempted suicide by sharpening his glasses lens and consuming parts of the glass. Id. During the attempt, officers used chemical agents to restrain Keaton and eventually escorted him to a decontamination shower and medical where a registered nurse administered an ETO (emergency treatment order) shot to sedate Keaton. Id. at 5. After medical staff completed Keaton's evaluation and treatment, officials took Keaton to an isolation management room where he slept. Id.

The next day, July 11, 2018, officers woke Keaton up and ordered him to move his state-issued mattress from the floor to the bunk. Id. Keaton alleges he followed these orders and immediately went back to sleep. Id. According to Keaton, around 1:30 p.m. that day, while he was still asleep on his bunk, Defendant Smith ordered Defendants Manning, Williams, Hampton, Bias, and Cartwright to enter Keaton's cell and perform a cell extraction. Id. During the extraction, Manning, Williams, Hampton, Bias, and Cartwright "violently punch[ed] [Keaton] in the head and facial area" while "repeatedly yelling for [Keaton] to stop resisting." Id. at 6. Keaton asserts he neither tried to resist nor did he fail to follow Smith's earlier orders to move his mattress off the floor, which Defendants relied on to justify this use of force. Id. Once Keaton was

3

restrained, officers escorted him to medical for a post-use-of-force exam that Keaton voluntarily refused. Id. at 6.

Officers then escorted Keaton back to his cell. Id. Once in his cell, Keaton states he refused to "relinquish" his hands for removal of the restraints. Id. at 6-7. Defendant Smith gave Keaton a "final order" to allow removal of the handcuffs and Keaton again refused. Id. at 7. According to Keaton, ten seconds after the "final order," Defendants Manning, Williams, Hampton, Bias, and Cartwright again entered Keaton's cell for a second "organized use of force." Id. Keaton contends he was not afforded the required three-minute window to follow Smith's "final order" before Defendants again used force. Id. He alleges that during the second use of force, Manning, Williams, Hampton, Bias, and Cartwright slammed his head against the floor, punched him in the face, and stuck their fingers in his right eye, trying to gouge it out. Id.

Keaton asserts that Defendants Smith and Mason were present for both cell extractions but did not intervene in or stop either use of excessive force. Id. He also contends that Smith obstructed the camera's view during the uses of force. Id. Following the second use of force, medical staff examined Keaton's injuries and noted he sustained a swollen right eye and a bloody mouth. Id. Keaton declared a medical emergency for his eye injury a few days later, and after seeing an ophthalmologist, he learned an area of his repaired retina had become re-detached. Id. at 8. Keaton was later diagnosed as blind in his left

eye. <u>Id.</u> at 9. He asserts Defendants' actions violated his rights under the Eighth Amendment. <u>Id.</u> at 3. As relief, Keaton requests compensatory and punitive damages.[3] <u>Id.</u> at 9.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An

---

[3] The Court dismissed Keaton's requests for declaratory relief and monetary damages against Defendants in their official capacities. <u>See</u> Order (Doc. 39).

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

---

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

### A. Defendants' Arguments & Evidence

In their Motion, Defendants contend that they are entitled to summary judgment because during both uses of force, Defendants Cartwright, Manning, Williams, Hampton, and Bias used no more force than necessary to overcome Keaton's non-compliance with orders, and as such, there was no reason for Defendants Smith and Mason to intervene. Motion at 14-28. They also argue they are entitled to qualified immunity; and they contend that to the extent

that Keaton's excessive force claim proceeds, he is not entitled to recovery of either compensatory or punitive damages. Id. at 29-34. In support of their Motion, Defendants rely on the following evidence.[5]

In January 2017, First Coast Retina Center evaluated Keaton who stated that he had been experiencing loss of vision in his left eye for over three years and reported suffering an injury to the eye following a "lock in sock" incident. Doc. 62-2 at 2. Doctors diagnosed him with "chronic retinal detachment." Id. In February 2018, an optometrist referred Keaton to a specialist for possible eye surgery. Id. at 3. On June 4, 2018, Keaton underwent surgery to repair a retinal detachment in his left eye. Doc. 62-19. On June 14, 2018, officials transferred Keaton to Union Correctional Institution. See Amended Complaint at 4. That same day, Keaton was involved in an unrelated use of force, after which medical did not conduct a post-use-of-force assessment "due to [Keaton's] disruptive behavior." Doc. 62-20 at 1. Keaton was involved in another unrelated use of force on June 24, 2018. Id. at 2-43.[6]

---

[5] Defendants also provide extensive exhibits related to Keaton's mental health and medical history. See generally Docs. 62-2 through 62-19. Because not all of that evidence is essential or necessary for the Court's analysis and adjudication of the issues here, the Court need not summarize those exhibits.

[6] Defendants contend that Keaton was also involved in unrelated uses of force on June 4, 2018, and June 27, 2018, see Motion at 7; but there is no record evidence showing uses of force on those dates. See generally Doc. 62-20.

On July 10, 2018, while Defendant Cartwright operated the handheld camera, officials used chemical agents on Keaton because he was creating a disturbance on his wing and refusing all orders to cease his actions. Doc. 62-22 at 10. Following his decontamination shower, officials moved Keaton to another cell. Doc. 62-21 at 19. Once inside, Keaton became upset, smeared feces on himself and his cell window, broke his eyeglasses, and attempted to cut his wrist while eating portions of the broken glass. Id. Officials used another round of chemical agents on Keaton before restraining him. Id. During his post-use-of-force exam, medical staff administered an ETO injection, which he "tolerated well," and placed him on self-harm observation (SHOS) status.[7] Doc. 62-20 at 51. The two uses of force at issue in this action occurred on the next day – July 11, 2018.

<u>First Use of Force</u>

An incident report completed by Caitlin McLaughlin explains that on July 11, 2018:

> Inmate Keaton . . ., who was currently on SHOS status, had misused his state property by having his mattress on the cell floor and refusing to place it back on his bunk. Dr. Anthony ordered that the mattress be removed. Inmate Keaton then refused all orders to submit to restraints so that he could be removed [sic] the cell and the mattress be confiscated. Authorization

---

[7] In his Response, Keaton clarifies that the July 10, 2018 events "are not 'central' to establishing" his claims, but merely provide background for the events of July 11, 2018. Response at 7 n.5.

for the use of a cell extraction team was received. The
team entered the cell and applied restraints to inmate
Keaton, at which time all force ceased. Inmate Keaton
was escorted to medical where he refused an
assessment, however a visual assessment was
conducted and he was noted with no injuries. Inmate
Keaton was then returned to his assigned cell where
he refused all orders to relinquish the hand restraints.
An additional organized use of force, in which the
restraints were removed, was conducted later on in the
shift. . . .

Doc. 62-23 at 6-7.

Video evidence of the first use of force supports the facts laid out in the

incident report.[8] See Def. Ex. O. At the beginning of the video, Defendant Smith

gives a lead-in statement explaining that Keaton's state-issued mattress is on

his cell floor and he is refusing all orders to pick it up and submit to hand

restraint procedures, so officers can safely remove the mattress from his cell.

Smith reports that Defendant Mason and Mental Health Professional Garriga

attempted to counsel Keaton, who is classified as a psych-grade 1 inmate, but

their efforts failed to gain Keaton's compliance. Smith explains that he notified

Colonel Jeffery Lindsey about the situation and Lindsey authorized the use of

a forced cell extraction. The cell extraction team then introduces themselves

as follows – #1 Defendant Manning, #2 Defendant Williams, #3 Defendant

Hampton, #4 Defendant Bias, and #5 Defendant Cartwright.

---

[8] The video footage is on two DVDs, one depicting the first use of force (Def. Ex.
O) and one depicting the second use of force (Def. Ex. P.).

After introductions, Smith escorts the cell extraction team to Keaton's cell door where the team members line up. Before they enter, Smith gives Keaton a final order to submit to restraint procedures, but Keaton does not respond. At minute 4:41, Smith opens Keaton's cell door and the extraction team calmly but quickly enters. Keaton is lying face down on his bunk as the team members surround him to apply restraints. Keaton slightly resists the extraction team's attempt to apply hand restraints. Smith issues a verbal order for Keaton to stop resisting while one extraction team member orders Keaton to "give [him] [his] hand." Smith announces that leg irons have been applied at minute 5:16 and that handcuffs have been applied at minute 5:28. The extraction team then helps Keaton to his feet and Keaton begins calling the officers vulgar and profane names. Keaton addresses the camera, yelling "I'd like to advise that a few of these officers hit me in the back of the head." Keaton also mocks and taunts the cell extraction team's use of force, saying they will have to hit him harder next time if they want to knock him out. An extraction team member then applies a spit shield to Keaton while Keaton continues to yell profane words and complains that the restraints are too tight. The upper part of Keaton's face is visible above the spit shield and there are no apparent bruises, scratches, or other signs that Keaton suffered any physical injuries. The team then escorts Keaton to medical where Keaton immediately

announces that he is "refusing" medical attention. The extraction team then walks Keaton back to the cell wing.

Once cell front, the cell extraction team removes Keaton's leg restraints and walks Keaton into his cell before exiting and shutting the cell door. The team members then order Keaton to submit to the removal of his hand restraints. Keaton begins yelling incoherent statements and can be seen through the cell window taking his clothes off. Keaton then approaches the cell window in an aggressive manner and screams at Defendant Mason as Mason calmly asks Keaton to submit to removal of his hand restraints. Keaton then threatens to "beat" the officers up and responds to all requests to comply by saying "f*ck you." The video of the first use of force then ends.

In another incident report, Officer McLaughlin states that Keaton received a disciplinary report for his conduct following the return to his cell:

> Following an organized cell extraction, inmate Keaton . . . refused to relinquish the hand restraints when he was returned to his assigned housing. Officer Armstrong remained cell front when he observed inmate Keaton threaten staff stating "the next person to come inside my cell, I'm kicking!" Inmate Keaton will be receiving a D.R. for 1-3, Spoken Threats.

Doc. 62-23 at 16.

In his deposition, Keaton testified that he was still "out cold" from the effects of the ETO shot when officers woke him up and asked him to get his mattress off the ground. Doc. 62-21 at 24. He stated that he told officers to

12

"leave [him] alone" before falling back asleep. Id. He asserted that he eventually complied with their orders and picked up his mattress before getting back into his bunk. Id. According to Keaton, after he fell back asleep, officers came into his cell and began punching him in the face and head. Id. He testified that he did not physically resist the cell extraction team's efforts to apply restraints. Id. at 31. But Keaton admitted that once restraints were applied, he used profanity and mocked the officers' use of force, telling one extraction team member that "he hits like a female dog." Id.

The Office of the Inspector General (OIG) conducted a review of Defendants' first use of force. See generally Doc. 62-23. The OIG concluded that the first use of force complied with the FDOC's rules and procedures, finding that "[n]o further review [was] warranted . . . as the inmate's allegations [were] not supported by the evidence reviewed and therefore [were] not substantiated." Id. at 5.

Second Use of Force

Another incident report describes the circumstances of the second use of force:

> Inmate Keaton . . . had been returned to his assigned cell following an organized cell extraction when he refused all orders to allow the hand restraints to be removed . . . . Authorization was received to utilize a cell extraction team to enter the cell and remove the restraints. The team attempted to enter the cell, however inmate Keaton pushed on the cell door in an

13

> attempt to prevent the team from entering. Staff forced their way into the cell and pinned inmate Keaton to the cell floor, facedown. The hand restraints were removed and all staff exited the cell at which time all force ceased. Inmate Keaton received a cell front post use of force physical and was noted with a swollen right eye and minimal bleeding to the mouth.

Doc. 62-25 at 4-5.

The video of the second use of force begins with Defendant Smith's lead-in statement, during which he explains that Keaton is in his cell, has possession of his hand restraints, and is refusing orders to relinquish the restraints. See Def. Ex. P. Smith states that a mental health professional counseled Keaton to no avail. He then contends that officers notified Warden Anderson who authorized the use of force to remove the restraints from Keaton's cell. The cell extraction team members again introduce themselves as follows – #1 Defendant Manning, #2 Defendant Williams, #3 Defendant Hampton, #4 Defendant Bias, and #5 Defendant Cartwright. Smith and Defendant Mason escort the extraction team to Keaton's cell front. Smith issues a final order for Keaton to relinquish his hand restraints and Keaton does not respond.

Smith opens Keaton's cell door at minute 7:14. Keaton can be seen pushing the other side of the cell door in an attempt to keep it shut. Once the extraction team members push inside the cell, they immediately pin Keaton to the floor. The extraction team members then crowd around Keaton on the floor,

14

obscuring any view of Keaton and making it impossible to see any team member's individual movements. The extraction team members appear to struggle with Keaton. It appears that Keaton is now completely naked as the officers can be heard reminding the cameraman to not film nudity and the cameraman focuses the camera on filming Keaton from the waist up. The extraction team members order Keaton to "give [them] [his] hands," Smith orders Keaton to "stop resisting," and Mason orders Keaton to "just lay there." In response, Keaton calls Mason "a b*tch." At minute 8:58, Keaton screams that he is not resisting. About 42 seconds later, at minute 9:40, the cell extraction team members remove the hand restraints and pass the cuffs to Smith who hands the cuffs to an officer outside the cell.

All movements indicating a physical struggle immediately stop and the extraction team orders Keaton to stay on the ground before exiting the cell. Keaton is seen lying on the ground and the shield is laying over Keaton's back. The last team member who exits removes the shield from the cell and closes the cell door at minute 10:18. Officers immediately request that medical staff evaluate Keaton. Keaton can be seen through the cell window. He is naked and lying face down on the cell floor. Within seconds, the officer holding the handheld camera backs away from the cell and a medical staff member is seen approaching Keaton's cell window. Officers ask Keaton to "cover" himself up and address medical. Keaton complains about eye pain and screams "I can't

15

see." After documenting Keaton's injuries, medical staff walks away, and the camera again approaches Keaton's cell window. Keaton is now standing and is visibly crying, stating that he cannot see. Keaton addresses the camera, screaming that he has "been punched 30 times" before pointing at the camera and stating, "I'm going to kill one of you b*tches." The video of the second use of force then ends.

According to medical documents, during the post-use-of-force evaluation, medical staff noted Keaton had a swollen right eye and a "bloody mouth [with] minimal" bleeding. Doc. 62-25 at 16.

In his deposition, Keaton explained he refused to give up the handcuffs because he was "in emotional distress" from the first use of force. Doc. 62-21 at 33-34. He admitted officers issued more than one order for him to return the handcuffs, which he refused, and that he threatened to "beat one of their A double S[s]." Id. at 34. Keaton also acknowledged that Smith issued a final order to relinquish the hand restraints before breaching his cell. Id. at 37. He conceded that he pushed the cell door "to stop them from coming in" when the extraction team tried to enter. Id. at 37-38. When asked if he believed the second use of force could have been avoided, Keaton responded that "[i]t probably could have," but he "wasn't in [his] right state of mind at the time" and had decided he was "not giving [them] anything." Id. at 38-39.

16

According to Keaton, during the use of force, one officer "banged" his head into the concrete and another "stuck their hand in [his] good eye" (right eye). Id. at 39-40. Keaton stated that he then experienced swelling and "orbital trauma" in his right eye, which eventually healed following medical treatment. Id. at 42, 47, 55. He testified that he did not know that his left-eye retina had become re-detached until he saw the ophthalmologist on August 2, 2018. Id. at 41, 45. Keaton also admitted that following the second use of force, the only physical injuries he had at that time were the ones medical staff documented during the post-use-of-force evaluation. Id. at 49. Keaton also explained that he received "several" disciplinary reports (DR) following the July 11, 2018 events. Id. at 67. Regarding those DRs, he testified that he was guilty of some of the charges because he "did make [ ] a spoken threat when [he] was in the SHOS cell" and he "did refuse to give up the hand restraints, which is disobeying an order." Id. at 68.

The OIG reviewed the second use of force, found it complied with the FDOC's procedures, and closed the case. See generally Doc. 62-25.

### Defendants' Declarations

Each Defendant submitted a declaration describing his actions during both uses of force. See Docs. 62-31, 62-32, 62-33, 62-34, 62-35, 62-36, 62-36, 62-37. In his declaration, Smith states:

17

> During each use of force incident, I provided a final order and warned inmate Keaton that the cell extraction team would enter the cell if he failed to comply.
>
> In both use of force incidents, I repeatedly ordered inmate Keaton to stop resisting and comply with my orders, however inmate Keaton failed to comply.

Doc. 62-31 (paragraph enumeration omitted). In his declaration, Mason explains:

> I attempted to de-escalate the situation by speaking with inmate Keaton and attempted to persuade him to comply with the orders given to submit to restraints (first use of force incident) and relinquish his handcuffs (second use of force).
>
> In both use of force incidents, I observed inmate Keaton physically resisting and not complying with orders given.

Doc. 62-32 at 2 (paragraph enumeration omitted). Smith and Mason both assert:

> During the first cell extraction the objective was to remove inmate Keaton's mattress pursuant to an order [from Dr. Anthony in medical.]
>
> During the second cell extraction, the objective was to restrain inmate Keaton to remove the handcuffs that he previously refused to relinquish.
>
> While supervising I observed the cell extraction team use only the amount of force necessary to overcome inmate Keaton's physical resistance to orders given.

Docs. 62-31 at 2, 62-32 at 2-3 (paragraph enumeration omitted).

18

In their declarations, Bias, Cartwright, Hampton, Manning, and Williams explain they were part of the cell extraction team involved in both uses of force. Docs. 62-33, 62-34, 62-35, 62-36, 62-37. They then describe their actions during the first use of force. Bias and Cartwright state:

> [We] entered the cell and [Bias] grasped Mr. Keaton's [right leg] while [Cartwright] grabbed his [left leg]. It was our responsibility to apply leg irons, and did so despite Mr. Keaton's physical resistance, jerking of his limbs and his repeated failure to comply with [ ] Smith's orders.

Docs. 62-33, 62-34. Hampton states:

> I entered the cell and grasped Mr. Keaton's left arm and forced it out from under his body where he forcefully held it in resistance. I placed his arm behind his back and once the team gained control of his extremities, [ ] Williams placed the hand restraints on him.

Doc. 62-35 at 2. Williams declares:

> I entered the cell and placed both of my hands on Mr. Keaton's torso to pin him down to the cell bunk. Once the team was able to gain control of his arms and place them behind his back, I placed the hand restraints on him.

Doc. 62-37 at 2. Manning explains:

> I entered the cell and placed the security shield on inmate Keaton's back pinning him face down on his bunk[.] I discarded the shield and grasped Mr. Keaton's right arm placing it behind his back despite his physical resistance.

> Once he was secured and lifted to his feet, I placed a
> spit shield on him for precautionary measure based on
> [Keaton's] aggression, irritation, and previous history
> of using his bodily fluids to thwart officer efforts to
> secure him. At this point all force ceased and Mr.
> Keaton was taken out of his cell for a medical
> evaluation and to allow the removal of his mattress.

Doc. 62-36 at 2 (paragraph enumeration omitted).

Defendants also described their actions during the second use of force. According to Bias, Cartwright, Hampton, Manning, and Williams, following the first cell extraction, Keaton "refused to give up his handcuffs and the team was told a second cell extraction was authorized." Docs. 62-33, 62-34, 62-35, 62-36, 62-37. They explained that "[d]uring the second cell extraction, Mr. Keaton pushed his body up against the door from the inside, and the same cell extraction team . . . forced the door and Mr. Keaton backwards to allow us to enter the cell." Docs. 62-33, 62-34, 62-35, 62-36, 62-37. Bias and Cartwright stated that they both grabbed Keaton's left arm while Williams removed the hand restraints, and once the restraints were removed, they released their grasp and ceased their force. Docs. 62-33, 62-34. Hampton and Williams reported that they both grabbed Keaton's right arm, and once in control, Williams removed the restraints and they both released their grasps and all force ceased. Docs. 62-35, 62-37. Manning explained:

> I entered the cell and used the shield to create distance
> between the team and inmate Keaton and force him to
> the ground. I used the shield to pin Mr. Keaton's torso

while the remaining team members struggled to gain control of his extremities.

Once the hand restraints were removed, I used the shield to pin Mr. Keaton to the floor to allow for the cell extraction team to exit the cell safely. At this time all force ceased.

Doc. 62-36 (paragraph enumeration omitted).

## B. Keaton's Arguments and Evidence

In opposition to Defendants' Motion, Keaton argues that before the first use of force, he complied with officers' orders to pick his mattress up off the floor and place it on the bunk. Response at 2. According to Keaton, because he complied with the order, "there existed no reason to apply force." Id. at 6. Keaton also contends he never resisted officers during the first use of force, and Defendants' force was excessive because they violently punched Keaton in the head and facial area. Id. He argues that the video evidence does not contradict his allegations because Defendant Smith was obscuring the handheld camera's view when the cell extraction team members were punching him. Id.

As to the second use of force, Keaton again argues that he never resisted but the cell extraction team "with malicious and sadistic intent, began to slam [his] head into the concrete floor, violently punch him in the head and facial area, and stuck their finger into [his] right eye in an attempt to gouge it out of the socket." Id. at 4. Keaton asserts that the video evidence shows Defendants

21

slamming his head into the floor and you can hear Keaton state that he is "not resisting." Id. at 4 n.3. He also contends that Defendants' intent to harm Keaton can be inferred from the fact that they did not remove him from the cell during the second use of force. Id. at 6. Keaton further asserts Defendants are not entitled to qualified immunity and he is entitled to recover compensatory and punitive damages. Id. at 5.

Keaton provides the following exhibits to support his arguments: July 10, 2018 and July 11, 2018 emergency room records (Doc. 25-1, 25-2, 25-4); DR log # 213-180517 charging Keaton with disobeying an order (Doc. 25-3); July 13, 2018 sick-call request and documents from the sick-call visit (Doc. 25-5); documents from Keaton's October 2018 vision assessment (Docs. 25-6, 25-7); informal grievance (log # 213-1807-0226) (Doc. 25-8); Defendants' response to Keaton's second request for admissions (Doc. 67-1 at 4-11); Defendants' response to Keaton's interrogatories (id. at 13-73); Defendants' response and objections to Keaton's first request for admissions (id. at 75-81); Defendants Cartwright and Smith's admissions (id. at 83-95); medical documents from Keaton's June 6, 2018 visit with ophthalmologist Dr. Brooks (id. at 97-100); medical documents from Keaton's May 24, 2018 visit with Dr. Brooks (id. at 102-11); informal grievance (log # 23-807-0230) (id. at 114); October 10, 2024 acknowledgment form (id. at 116); and his own declaration (id. at 117).

In his declaration, Keaton contends he did not resist during either incident; he never misused his mattress to block security from doing 15-minute checks; no one intervened during the uses of force; excessive force was used on him; these incidents have exacerbated his depression level; and Defendant Smith made a false statement when he stated "DR log # 213-180529 was written on 7/11/18 at 14:00." Doc. 67-1 at 117.

## V. Applicable Law

### A. Eighth Amendment Excessive Force

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987). However, it is well understood that prison guards, who are charged with maintaining order and security, may use force when necessary to bring unruly inmates into compliance. Whitley v. Albers, 475 U.S. 312, 320-21 (1986); Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991).

In Sconiers v. Lockhart, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force" claims:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as

proscribed "cruel and unusual punishment." <u>Hudson
v. McMillian</u>, 503 U.S. 1, 5 (1992). Nevertheless, the
Supreme Court has instructed that what rises to the
level of an "unnecessary and wanton infliction of pain"
differs based on the type of Eighth Amendment
violation alleged. <u>Id.</u>

. . . "[T]he core judicial inquiry" requires [the
Court] to consider "whether force was applied in a
good-faith effort to maintain or restore discipline, or
maliciously and sadistically to cause harm." <u>Wilkins</u>,
559 U.S. at 37.[9] This standard requires a prisoner to
establish two elements – one subjective and one
objective: the official must have both "acted with a
sufficiently culpable state of mind" (the subjective
element), and the conduct must have been "objectively
harmful enough to establish a constitutional
violation." <u>Hudson</u>, 503 U.S. at 8.

With respect to the subjective element, "to have
a valid claim . . . the excessive force must have been
sadistically and maliciously applied for the very
purpose of causing harm." <u>Johnson v. Breeden</u>, 280
F.3d 1308, 1321 (11th Cir. 2002); <u>see also</u> <u>Thomas v.
Bryant</u>, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-
force violation, it focuses on whether the official's
actions were "harmful enough," <u>Hudson</u>, 503 U.S. at 8,
or "sufficiently serious," <u>Wilson v. Seiter</u>, 501 U.S. 294,
298 (1991), to violate the Constitution. "Not every
malevolent touch by a prison guard gives rise to a
federal cause of action." <u>Wilkins</u>, 559 U.S. at 37. "The
Eighth Amendment's prohibition of 'cruel and
unusual' punishments necessarily excludes from
constitutional recognition <u>de minimis</u> uses of physical
force, provided that the use of force is not of a sort
repugnant to the conscience of mankind." <u>Id.</u> at 37–38.
Instead, the Eighth Amendment prohibits force that

---

⁹ <u>Wilkins v. Gaddy</u>, 559 U.S. 34 (2010) (per curiam).

> offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." Wilkins, 559 U.S. at 37.

Id. at 1265–66 (internal citations cleaned up).

Courts consider five distinct factors when determining whether an officer applied force maliciously and sadistically for the purpose of causing harm:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475 U.S. at 321; Hudson, 503 U.S. at 7). Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[10] (quoting Whitley, supra, at 321, 106 S. Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id. at 9 (quoting

_____

[10] Hudson, 503 U.S. at 7.

Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[11]

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38. Nevertheless, a prisoner's injuries or lack thereof may be "evidence of the kind or degree of force that was used by [an] officer." Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021) (citing Crocker v. Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021)).

In considering the Whitley factors, courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)). Moreover, corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." Danley, 540 F.3d at 1307. As such, "courts must determine whether the evidence goes beyond a mere dispute

---

11 See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

over the reasonableness of a particular use of force or the existence of arguably superior alternatives." <u>Whitley</u>, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." <u>Id.</u>

## B. Failure to Intervene

The law is well-established that a corrections officer has a duty to intervene when he witnesses a fellow officer's use of excessive force against an inmate and is in a position to intervene. <u>See</u> <u>Helm v. Rainbow City, Ala.</u>, 989 F.3d 1265, 1272 (11th Cir. 2021) (citing <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 924-27 (11th Cir. 2000)). "Of course, there also must be an underlying constitutional violation. Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." <u>Sebastian v. Ortiz</u>, 918 F.3d 1301, 1312 (11th Cir. 2019) (citations omitted). Notably, a failure-to-intervene claim is "wholly dependent on the underlying excessive force claim." <u>Id.</u>

## C. Qualified Immunity

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1255

(11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a
result, the qualified immunity defense protects from suit "'all but the plainly
incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338
F.3d 1259, 1266 (11th Cir. 2003) (citation omitted). Indeed, as "'government
officials are not required to err on the side of caution,' qualified immunity is
appropriate in close cases where a reasonable officer could have believed that
his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002)
(quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, an official bears the initial burden
of establishing that his conduct fell within his discretionary authority. See
Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007). If the defendant does
so, the burden shifts to the plaintiff to demonstrate that qualified immunity is
not appropriate using the two-prong test established by the Supreme Court in
Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the
Court must ask whether the facts viewed in the light most favorable to the
plaintiff "show the officer's conduct violated a constitutional right." Id.; see also
Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260,
1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). The
court must also ask whether the right allegedly violated was clearly
established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533
U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th

28

1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct.") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at 1328.

Also, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is typically entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)). However, in this case, while Keaton alleges that Defendants Cartwright, Williams, Manning, Hampton, and Bias collectively used excessive force, he does not know which of those Defendants punched him and/or stuck their finger in his right eye or if Defendants Smith and/or Mason were in a position to intervene in both uses of force. See Doc. 62-21 at 39. The Eleventh Circuit has recognized "that a plaintiff is not required to specifically identify which particular officer used excessive force (and which officers failed to intervene) in order to overcome summary judgment." Hunter

v. Leeds, City of, 941 F.3d 1265, 1282 n.19 (11th Cir. 2019). "Were this the law, all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence." Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007); see also Alexandre v. Ortiz, 789 F. App'x 169, 176 (11th Cir. 2019). Because the evidence here does not illuminate which Defendant or Defendants participated in the alleged punching and eye gouging or the extent of their participation in the alleged conduct, the Court is unable to individually analyze the actions of each Defendant. See Velazquez, 484 F.3d at 1342 (rejecting the defendants' argument that "because [the plaintiff] did not see who beat him, if anyone did, there would be no evidence at trial from which a jury might assign liability for the beating"). As such, the Court's analysis applies equally to all Defendants.

## VI. Analysis[12]

Keaton contends that Defendants violated his rights under the Eighth Amendment by twice using excessive force (Defendants Cartwright, Williams, Manning, Hampton, and Bias) and failing to intervene during those uses of

---

[12] In determining whether a Defendant is entitled to qualified immunity, the Court views the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to Keaton to the extent supported by the record and then considers "the legal issue of whether [those] 'facts', if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott, 550 U.S. at 381 n.8. The facts viewed in this manner may differ from those that ultimately can be proved.

excessive force (Defendants Smith and Mason). Amended Complaint at 3. Defendants assert they are entitled to qualified immunity on Keaton's claims. Keaton does not dispute that Defendants were acting within their discretionary authority at the relevant times. Thus, the burden shifts to Keaton to show that Defendants are not entitled to qualified immunity.

## A. First Use of Force

Keaton argues that the first use of force constituted excessive force because "there existed no reason to apply force" after he complied with the order to place his mattress on his bunk. Response at 6. And, according to him, even if he never complied with orders to pick up his mattress, Defendants' actions of "punching him repeatedly in the head and facial area while [he] offer[ed] no resistance was excessive." Id. Defendants argue that Keaton's failure to comply with orders to submit to restraints for the removal of his mattress necessitated their organized use of force. Motion at 15. They also contend that during the cell extraction, they used minimal force to apply restraints and remove Keaton from his cell, allowing for his mattress to be successfully removed. Id. at 15-16.

Upon review of the evidence, the Court concludes that Keaton fails to establish that Defendants' first use of force violated his Eighth Amendment rights. After applying the Whitley factors to the summary judgment record here, the undisputed evidence reveals no genuine issue of material fact about

whether Defendants applied force in a good-faith effort to maintain or restore discipline. First, there is no evidence that the first use of force caused Keaton to sustain any physical injuries. Indeed, during his deposition, Keaton testified that the only physical injuries he suffered following the July 11, 2018 events were those that were sustained and documented following the second use of force. Doc. 62-21 at 19.

Second, Defendants reasonably perceived that force was needed because the video evidence clearly depicts that he refused to comply with all lawful orders to submit to hand restraints so that his mattress could be safely removed from his cell.[13] Third, the force used was minimal – Defendants efficiently and calmly restrained Keaton and escorted him out of his cell within 60 seconds. They then calmly walked him down the hallway as Keaton's verbal statements became more aggressive and derogatory. Keaton alleges that Defendants punched him in the back of the head during this use of force, and while he admits that the punches are not visible on the videorecording, he argues that Defendant Smith intentionally obscured the camera's view of the punches. Response at 2. But while the view is somewhat obstructed at times,

---

[13] Keaton argues that force was unnecessary because he eventually moved his mattress off the floor. However, because he intentionally failed to timely comply with that order, officers then ordered Keaton to submit to restraints so that they could remove the mattress from his cell. Keaton's repeated refusal to follow those subsequent orders and allow officers to remove the mattress led to the authorization of Defendants' first use of force.

the cell extraction team members are largely visible, and no punching-like movements are seen and Keaton's lack of injuries and vehement refusal to see medical after the use of force undermine his assertions. Also, Keaton's statements mocking Defendants' use of force and encouraging them to hit him harder next time contradict any inference that Defendants applied force solely to inflict pain. Further, Defendants' application of a spit shield did not amount to excessive force. Rule 33-602.028(3)(b)2, Florida Administrative Code, authorizes the spontaneous use of a spit shield when, following the use of force, an inmate is on any confinement status, has a documented threat of using bodily fluids, and is exhibiting aggressive behavior. See Doc. 62-27. Here, Keaton was on SHOS status, had a documented history of smearing feces on himself and his cell, and was using aggressive and profane language following the use of force.

Fourth, Defendants made several efforts to temper the severity of the forceful response. Keaton testified that he ignored initial orders to get his mattress off the floor, telling Defendant Smith to "leave [him] alone." Although Keaton eventually moved his mattress, Keaton's repeated refusal to timely adhere to that order escalated the situation and resulted in Defendants ordering him to submit to restraints for the removal of his mattress, which Keaton again repeatedly refused. Defendant Mason and Mental Health Professional Garriga also attempted to counsel Keaton to no avail. And only

after Keaton refused Defendant Smith's final order did Defendants resort to physical force to restrain Keaton. Lastly, considering how long Keaton continued to resist Defendants' orders to get his mattress off the ground and then submit to restraints for the removal of his mattress, it was reasonable for Defendants to consider Keaton a threat to safety.

In sum, the undisputed evidence reveals no genuine issue of material fact about whether Defendants Manning, Williams, Hampton, Bias, and Cartwright's first use of force was applied in a good-faith effort to maintain or restore discipline. They applied force to quell Keaton's refusal to comply with orders and did not do so under malicious or sadistic motives. Likewise, because the Court finds that the use of force was reasonable, Keaton's failure to intervene claims against Defendants Smith and Mason must also fail. As such, Defendants are entitled to qualified immunity on Keaton's excessive force claim and failure to intervene claim related to the first use of force.

## B. Second Use of Force

Keaton argues that during the second use of force, once the extraction team was inside his cell, Defendants forced him to the ground and "with malicious and sadistic intent, began to slam [his] head into the concrete floor, violently punch him in the head and facial area, and stuck their finger into his right eye in an attempt to gouge it out of the socket." Response at 4. He asserts he never resisted, and Defendants never extracted him from the cell even

34

though that was the purpose of the cell extraction team's force. Id. Defendants argue that because Keaton failed to comply with orders to relinquish his hand restraints, Defendants were forced to enter his cell to obtain the handcuffs. Motion at 21. They contend that Keaton resisted their efforts and once they were able to safely restrain him and remove the cuffs, all force ceased. Id.

Upon review of the evidence and affording Defendants "a wide range of deference" in maintaining prison security, the Court concludes that the undisputed evidence shows no genuine issue of material fact as to the second use of force. First, as to the extent of Keaton's injuries, in his Amended Complaint, Keaton complained of a swollen right eye with orbital trauma, a bloody mouth, and a re-detachment of his left retina, resulting in permanent blindness in his left eye. Amended Complaint at 9. However, the record evidence does not support an inference that the second use of force resulted in the re-detachment of Keaton's left-eye retina. The medical records show that the only injuries medical staff documented during Keaton's post-use-of-force exam were a swollen right eye and a bloody mouth with minimal bleeding. On July 13, 2018, Keaton submitted a sick-call request, in which he only complained of right-eye pain. Doc. 25-5. When medical staff examined him in sick call on July 18, 2018, Keaton reported that "somebody punched [him] in the" right eye. Doc. 62-28 at 2. Medical then noted that no blood was observed and recorded his visual acuity as 20/15 in his right eye and 20/40 in his left

eye. Id. In his deposition, Keaton acknowledged that the only injuries he sustained during the second use of force were the documented right-eye injury and a bloody mouth. Doc. 62-21 at 49. Keaton maintained that he never experienced blindness in his right eye but that the swelling made it difficult for him to open the right eye. Id. at 54. He explained that after his July 13, 2018 sick-call request, medical staff examined his right eye and prescribed him eye drops. Id. at 49-50. And he testified that he did not know that his left-eye retina had re-detached until his August 2, 2018 follow-up appointment with the ophthalmologist. Id. at 50. According to the medical notes from his August 2, 2018 ophthalmology visit, Keaton reported that he had been experiencing vision issues in his right and left eyes for "about 2 months" prior, which is before the July 11, 2018 uses of force. Doc. 62-29. Dr. Brooks noted Keaton's "left eye remain[ed] stable under silicone oil . . . [and] there [was] still an area that [was] detached inferiorly with some elevation seen . . . [with] [n]o further treatment [] required at th[at] time." Id. at 2. Keaton testified that by the time he saw the ophthalmologist on August 2, 2018, the swelling in his right eye had resolved and he could see out of that eye again. Id. at 51. While the evidence shows that Keaton's left-eye retina re-detached at some point before August 2, 2018, there is no evidence to suggest that it re-detached during or as a result of the second use of force.

36

Second, there was a need for force because Keaton refused to comply with lawful orders to relinquish his hand restraints. The video evidence shows that after the removal of his leg restraints, Defendants shut the cell door and ordered Keaton to submit to removal of his handcuffs. In response, Keaton yelled incoherent things to the extraction team, took his clothes off, and approached the cell window in an aggressive manner before screaming at Defendant Mason as Mason calmly asked Keaton to submit to the removal of his hand restraints. Keaton then threatened to "beat" the officers up and responded to all requests to comply by saying "f*ck you."

Third, the amount of force used was reasonable under the circumstances. Keaton testified that he refused to give up the cuffs and told Defendants to "come and get [him]" while threatening to "beat one of their A double S[s]." He admitted that when the cell extraction team tried to open his cell door, he actively pushed the door to stop them from coming in. As mentioned, once the cell extraction team entered the cell, the video evidence does not show the individual, specific movements of Keaton or the cell extraction team members. While there seems to be a physical struggle, no punching movements can been seen and there is no footage of an extraction team member sticking his finger in Keaton's right eye. Rather, the only things discernable from the recording are Keaton's initial physical resistance to the cell door opening and the officers' repeated orders directing Keaton to "stop resisting." In any event, "[a]lthough

[the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that some amount of force was justified under the circumstances, and that the force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" Brown v. Smith, 813 F.2d 1187, 1189-90 (11th Cir. 1987) (quoting Whitley, 475 U.S. at 322). Indeed, about two minutes and thirty seconds after Defendants enter the cell, they successfully remove the hand restraints and begin calmly exiting the cell. At that time, all physical force had ceased, and Keaton remained on the floor with the shield over his body until the last team member exited. The officers then immediately summoned medical staff to examine Keaton cell front. See Cockrell v. Sparks, 510 F.3d 1307,1312 (11th Cir. 2007) (evidence that officers immediately requested medical assistance for an injured inmate was strong evidence that there was no malicious or sadistic purpose in the use of force).

Fourth, before resorting to force, Defendants made several efforts to temper their response. They issued numerous verbal orders and attempted to counsel Keaton, but Keaton continued to refuse to comply and became increasingly disrespectful and aggressive. Keaton testified that the second use of force could have been avoided if he complied with orders to relinquish his

handcuffs, but he "wasn't in [his] right state of mind at the time" and had concluded that he was "not giving [Defendants] anything." Doc. 62-21 at 38-39. Because of Keaton's unrelenting misconduct, officers contacted Warden Anderson who authorized the use of force to remove the restraints.

Finally, given how long Keaton continued to resist orders and his growing aggression, it was reasonable for Defendants to consider him a threat to safety. Defendants knew Keaton was a psych-1 inmate on SHOS status because of events that occurred the day before. They knew he first refused orders to submit to restraints for the removal of his mattress, which resulted in the first use of force. And they knew that upon his return to his cell, he had refused all orders to relinquish his handcuffs. Keaton had progressively become more hostile toward Defendants and threatened to harm officers before the second use of force. Keaton, by his own admission, had no intent on relinquishing the handcuffs or otherwise "giving [Defendants] anything" they requested. After Defendants finally removed the cuffs, the video evidence shows that Keaton's threats only became worse as he told officers, "I'm going to kill one of you b*tches."

On this record, the Court finds Keaton does not present evidence establishing a genuine issue of material fact on his claim that Defendants Manning, Williams, Hampton, Bias, or Cartwright used excessive force during their removal of his hand restraints. If this case proceeded to trial, Keaton

would have only his own testimony that one unidentified member of the cell extraction team stuck their finger in his right eye solely to inflict pain. But "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Herrington</u>, 381 F.3d 1243 at 1247. Likewise, because the Court finds that the use of force was reasonable, Keaton's failure to intervene claims against Defendants Smith and Mason must also fail. As such, Defendants are entitled to qualified immunity on Keaton's excessive force claim and failure to intervene claim related to the second use of force.

Accordingly, it is now

**ORDERED AND ADJUDGED**:

1.    Keaton's Motion to Strike Defendants' Motion for Summary Judgment (Doc. 70) is **DENIED**.

2.    Defendants' Motion for Summary Judgment (Doc. 62) is **GRANTED**.

3.    The Clerk is directed to enter judgment in favor of Defendants and against Keaton; terminate any pending motions; and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of January, 2025.


MARCIA MORALES HOWARD
United States District Judge


Jax-7

C:    Robert James Keaton, #R38757
      Counsel of record